498 P.2d 228

Bernice M. CHALUPA, Petitioner,

v.

The INDUSTRIAL COMMISSION of
Arizona, Respondent,
J. C. Penney Co., Respondent Employer,
Travelers Insurance Co., Respond-
ent Carrier.

*No. 1 CA–IC 652.*

Court of Appeals of Arizona,
Division 1,
Department B.

June 20, 1972.

Rehearing Denied July 24, 1972.

Review Granted Sept. 26, 1972.

Langerman, Begam & Lewis, P. A., by
Jack Levine, Phoenix, for petitioner.

William C. Wahl, Jr., Chief Counsel, Phoenix, for respondent, The Industrial Commission of Arizona.

Burch, Cracchiolo, Levie, Guyer & Weyl, by Joseph L. Moore, Phoenix, for respondent employer and respondent carrier.

HAIRE, Chief Judge, Division 1.

This appeal by way of certiorari challenges the lawfulness of an Industrial Commission award finding that petitioner had no permanent disability as a result of an industrial accident, and that her industrial injury was not a proximate cause of a subsequent fall.

On November 25, 1969 petitioner sustained injury while employed at J. C. Penney Co. when a chair, upon which she was about to sit, slipped from under her, causing her to fall flat on her coccyx. Petitioner continued working that day. The following morning she sought the services of Dr. Gaylord Davis, a chiropractor. Throughout the pre-Christmas holiday season she continued to work, although she complained of back and leg pain and numbness in the right arm.

On December 26 petitioner left her employment indefinitely to obtain treatment for her lower back. She then came under the care of Dr. Victor Haag, a chiropractor and naturopath, and continued visiting him on almost a daily basis until May 14, 1970. On May 15, 1970 she left for Washington, D. C., to attend her son's graduation from Officer's Candidate School. On May 21, 1970, while in Washington, petitioner either lost the support of her left leg, or slipped, while crossing a street and sustained a serious fracture to her right kneecap.

In the interim, on April 7, 1970, petitioner had been referred to Dr. B. L. Gregory, an osteopath, for consulation. His prognosis was that the symptoms in the lumbar area were due to chronic lumbar strain due to lumbosacral instability. As to her legs, Dr. Gregory observed that they were occasionally painful, but that they did not give way while walking.

In addition, respondent insurance carrier had Dr. Robert A. Johnson, an orthopedic surgeon, examine petitioner on April 30, 1970. Dr. Johnson found no evidence of any weakness or atrophy in the upper or lower extremities, and no visible or palpable muscle spasms of the lumbar spine. X-rays were taken which showed some narrowing at the C–5 and C–6 disc level, but this was attributable to advanced degenerative disc disease which preexisted the November 25 injury. He also reported that petitioner showed no evidence of any residual from that injury, and no evidence of any objective findings which would prevent her from returning to work as a clerk.

On May 5, 1970, respondent insurance carrier issued a Notice of Claim Status terminating compensation benefits as of May 8, 1970. By letter of May 13, 1970 it also terminated medical benefits as of May 8. As previously mentioned, petitioner left for Washington on May 15 where she sustained her knee injury. As a result of that injury her kneecap was surgically removed on May 28, 1970 by Richard L. Morgan, M.D.

On June 26, 1970 petitioner filed a request for a hearing which was convened on December 16, 1970. At the hearing Dr. Haag testified to petitioner's complaints of pain in the neck, lower back, and right hand, and he added that these symptoms were still pretty much with her when she left his care on May 14. Asked if he had an opinion "to a reasonable degree of probability" as to the cause of the injuries, he replied affirmatively, stating he believed the industrial accident was responsible.

Later in the hearing Dr. Haag was asked his "medical" opinion as to the likely cause of petitioner's leg buckling under in Washington. Dr. Haag replied that he thought it "probable that such a fall could have been a result of an instability of the legs due to the lumbar sprain". He also

testified that he had observed this instability during his treatment of petitioner.

The only other testimony of a medical or paramedical nature at this hearing was that of Dr. Morgan, attending physician on the kneecap injury. He could offer no opinion as to the cause of the fall in Washington.

It did come out in the cross-examination of Dr. Morgan, however, that petitioner had indicated to him that the cause of her fall was from slipping, rather than loss of support in the left leg. This was evident from certain insurance forms Dr. Morgan had filled out which recited the history of the accident as given by the patient.

When petitioner was cross-examined on this point, she equivocated, claiming she was in so much pain after the accident that all she could think of at the time was that she had slipped. Asked repeatedly whether she had personally examined the area after the fall to determine that she had not slipped, petitioner claimed first that she had, and later that she had not, made such an examination.

On January 22, 1971 a second hearing was held to take the testimony of Dr. Johnson. He confirmed the findings of his April 30 report. He testified that petitioner suffered no disability at the time of his examination and exhibited no residual injuries which he could relate to the industrial accident. Asked his medical opinion as to whether the industrial accident could have been a causative factor in the Washington, D.C. fall, Dr. Johnson's reply was simply:

> "Well, I found no evidence of any residual on April 30th, 1970, and I would not expect any residual to occur after that if I did not find any residual at that time."

Following these hearings the Commission issued its award, finding that petition-er's condition had become medically stationary as of April 30, 1970, and that she had no permanent disability attributable or causally related to the industrial accident. Medical benefits were awarded from the time of the injury through May 14, 1970,[1] as were temporary disability benefits. Regarding the fracture to petitioner's right knee, the Commission found that the medical testimony of Dr. Johnson and Dr. Gregory, coupled with the initial history of the fall as recited by petitioner to Dr. Morgan, reasonably established that her fall was "idiopathic"[2] in nature and therefore not compensable.

In challenging these findings, petitioner argues that, although the Commission may accept the opinion of one medical expert over another, there is no authority for the proposition that it may rely upon opinion evidence when the uncontroverted facts are otherwise. We wonder what uncontroverted facts petitioner refers to. The fact that she continued to experience intermittent pain in the lower extremities was established. The fact that she fell in Washington also was established. Whether this fall was occasioned by slipping or a buckling of the left leg was an open question in light of both her statements to Dr. Morgan and her equivocal testimony at the hearing. Even assuming the truth of petitioner's account, however, this collection of facts did not establish a causal relationship between the industrial accident and the Washington fall. What was needed was expert testimony on the probability of such a relationship, as it was not such as was readily apparent to laymen. *See* Lowry v. Industrial Commission, 92 Ariz. 222, 375 P.2d 572 (1962); Altamirano v. Industrial Commission, 12 Ariz.App. 345, 470 P.2d 493 (1970); Montgomery v. Industrial Commission, 7 Ariz.App. 109, 436 P.2d 621 (1968).

---

1. The May 14 date was selected because respondent had failed to notify petitioner relative to the termination of medical benefits until then.

2. "Idiopathic" is defined in Webster's Third International Dictionary as:
   "1: peculiar to the individual; [and]
   "2: arising spontaneously or from an obscure or unknown cause."

Petitioner also challenges the validity of Dr. Johnson's finding of no objective evidence of any weakness in the lower extremities. She points to the fact that Dr. Johnson's examination was a brief 30 minute office examination under conditions substantially different from those attending her fall in Washington. The record reveals, however, that Dr. Johnson performed a customary and complete orthopedic examination in this period of time. Under these circumstances we hardly are inclined to say that the Commission erred in basing its award on his findings.[3]

Petitioner further urges that subsequent to Dr. Johnson's examination, Dr. Haag observed objective evidence of a persisting injury—evidence which, taken with related facts, support only his conclusions as to her disability and the cause of her second fall. This evidence, as indicated in Dr. Haag's testimony, consisted mostly of muscle spasms of the soft tissues and tenderness upon palpation in the lower back.

We do not doubt the competence of Dr. Haag, as a chiropractor and naturopath, to make these factual observations. The medical conclusions to be drawn therefrom, again however, are not readily apparent. Moreover, they are matters which only licensed medical doctors are qualified to present as expert opinion testimony.

In the recent case of Kay v. Industrial Commission, 17 Ariz.App. 232, 496 P.2d 875 (1972), Judge Eubank of this Court acknowledged the existence of a chiropractor's report supporting a claim of continued emotional disability attributable to an industrial accident, but he added:

". . . we deem it insufficient to create a medical conflict in the evidence. Gates v. Kilcrease, 66 Ariz. 328, 188 P. 2d 247 (1947); A.R.S. § 32–925, as

amended." Kay v. Industrial Commission, *supra* at n. 1.

Thus, held the Court, the report of a licensed medical doctor stating that there was no such disability was the only medical evidence before the Commission, and the Commission was bound to accept that evidence.

In another recent case, rendered from Department A of this Court, Judge Donofrio observed:

". . . the rule is well settled that a chiropractor is a competent witness in his qualified field. Lowman v. Kuecker, 246 Iowa 1227, 71 N.W.2d 586, 52 A.L. R.2d 1380 (1955). See also Ann. 52 A. L.R.2d 1384." Olivas v. Industrial Commission, 16 Ariz.App. 543, 546, 494 P.2d 743, 746 (1972).

Upon close analysis it is clear that the Olivas case is not at odds with the ruling in Kay, and does not require treating every statement or report by a chiropractor as expert medical evidence. The distinction which both Kay and Olivas draw by virtue of their respective factual context, and the distinction which we seek to draw here, is that while a chiropractor or naturopath may give testimony as to observable facts within his realm of knowledge and training, any other testimony he might offer which takes the form of medical conclusions (as to causation or disability, for example) cannot be regarded as expert medical testimony.

Kay involved a chiropractor's report which drew conclusions both as to a continuing disability and as to causation.

In Olivas, on the other hand, a chiropractor testified to observations (of severe muscle spasms) and physical measurements (of grip strength) which he had made; and these gave strong evidence of petition-

---

3. There was one area where Dr. Johnson's report proved to be based upon inadequate information. Dr. Johnson had concluded that there was no evidence of any objective findings which would prevent petitioner from performing the duties of a clerk. As the cross-examination of Dr. Johnson revealed, this statement was made without the knowledge that a fair portion of petitioner's work prior to her injury had involved moving large crates and boxes. This deficiency of information would not impair Dr. Johnson's medical conclusions as to permanency or causal relation to the second injury, however.

er's ill condition. The only testimony of a conclusory form which he offered was that these symptoms were disabling in nature. In light of the empirical evidence brought out in his examination, this conclusion was patent. Thus the testimony of the chiropractor in that case did not actually take the form of *medical* opinion, and it was properly accepted as competent.

) The authorities cited in both Kay and Olivas are fairly consistent with this distinction as well. In Gates v. Kilcrease, 66 Ariz. 328, 188 P.2d 247 (1947), the principal case cited in Kay, our Supreme Court observed that under the Arizona statutes, "it seems that the practitioner of naturopathy and chiropractic is limited to non-surgical *and non-medical* methods" of treatment. 66 Ariz. at 333–334, 188 P.2d at 250 (emphasis added). The relevant chiropractic statute, A.R.S. § 32–925 (1971–72), has received minor amendment since the Gates decision, but the validity of the Supreme Court's observation remains unaffected. In its present form the statute reads:

> "A person licensed under this chapter to practice chiropractic may adjust by hand any articulations of the spinal column. He shall not prescribe for or administer medicine or drugs, practice major or minor surgery, obstetrics or any other branch of medicine or practice osteopathy or naturopathy unless he is otherwise licensed therefor as provided by law."

The statutes delineating the educational requirements of naturopaths indicate that as a group they are likely to be relatively well schooled in medical matters. *See* A.R.S. § 32–1522. Nevertheless the provision defining naturopathy contemplates a practice which certainly is "non-surgical", if not "non-medical". A.R.S. § 32–1501, subsec. 2 states:

> " 'Naturopathy' includes all forms of physiotherapy and means a system of treating the abnormalities of the human mind and body by the use of drugless and nonsurgical methods, including the use of physical, electrical, hygienic and sanitary measures incident thereto."

And other decisions by our Supreme Court have made it clear that naturopaths, like chiropractors, are wholly prohibited by statute from prescribing or administering any type of internal or external drug, or performing any surgical operation. *See* Kuts-Cheraux v. Wilson, 71 Ariz. 461, 229 P.2d 713, supplemented on rehearing, 72 Ariz. 37, 230 P.2d 512 (1951); Nethken v. State, 56 Ariz. 15, 104 P.2d 159 (1940).

Although the authorities cited in Olivas contain general statements suggesting that a chiropractor is competent to testify as to medical causation and permanency, the principal case cited comes out of a factual context which severely limits the effect of this language. Lowman v. Kuecker, 246 Iowa 1227, 71 N.W.2d 586 (1955) was a case where the *sole* testimony as to the extent of future medical care required in the treatment of plaintiff's injuries was that of a chiropractor. His testimony simply was that based on past observations, this plaintiff "may find it necessary to come to the office for care or some other preparations almost as frequently for quite some time as he has in the past here". 246 Iowa at 1228, 71 N.W.2d at 587. This testimony was based upon objective findings of a subluxiated vertebrae and associated pain, the cause of which was not in issue. Under these circumstances the Iowa court held that the chiropractor was qualified to make the statements he made, and that the issue of future medical care was properly submitted to the jury. Given the absence of medical testimony to the contrary, we would agree that this was a proper result.

Many of the cases from other jurisdictions which rely upon Lowman are similarly limited or distinguishable. In Howell v. Cussons, 29 Colo.App. 572, 489 P.2d 1056 (1971) the Colorado Court of Appeals held that the testimony of a chiropractor as to the permanent disabilities of plaintiff, *which was expressed within the limits of reasonable chiropractic probability,* was properly admitted. We regard this deci-

sion as well advised, as it at least recognizes that differences between chiropractic and medical testimony do exist.

Another decision along the same line is Allen v. Hinson, 12 N.C.App. 515, 183 S. E.2d 852 (1971). It also recognized that a chiropractor is "qualified to express his opinion *in the field of 'chiropractory'*." 12 N.C.App. at 516, 183 S.E.2d at 853. (Emphasis in original). This included such matters "as to what he found upon examination [and as] to his treatment of the plaintiff." 12 N.C.App. at 517, 183 S.E.2d at 854. When the chiropractor ventured into such matters as the *cause* of the conditions found in plaintiff and as to the *permanency* of the injuries, however, the North Carolina court held that he had "carried his expertise far beyond the limitations of his qualifications as an expert in the field of chiropractic." 12 N.C.App. at 519, 183 S.E.2d at 855. We would agree, and this is precisely the situation we have in the case at bar.[4]

When Dr. Haag speculated as to the causal relation between petitioner's symptoms and the industrial accident, as to the permanency of her original injury, and as to the causal relationship between that injury and the subsequent fall in Washington, D. C., he was wholly without the field of his specialization. We do not say that, as a matter of law, the hearing officer should have excluded his testimony. We merely say that the Commission could properly regard it for what it was—essentially lay testimony, insufficient to raise a medical conflict with the testimony of Dr. Johnson.

Because neither the permanency of this industrial injury, nor its causal relation to the subsequent fall was readily apparent to laymen, expert medical testimony was needed to resolve these questions. Because the only qualified expert testimony on these matters was Dr. Johnson's, and because his testimony supported the Commission award,

that award must stand. *See* Kay v. Industrial Commission, *supra*; Romero v. Industrial Commission, 11 Ariz.App. 5, 461 P.2d 181 (1969); Sandoval v. Industrial Commission, 3 Ariz.App. 449, 415 P.2d 463 (1966).

The award is affirmed.

EUBANK, and JACOBSON, JJ., concur.

---

4. Cases which are not entirely in accord with our position include Klein v. Harper, 186 N.W.2d 426 (N.D.1971); Badke v. Barnett, 35 App.Div.2d 347, 316 N.Y.S. 2d 177 (1970).